**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| N-TRON CORPORATION, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION 09-0733-WS-C** |
| | ) | |
| ROCKWELL AUTOMATION, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter comes before the Court on defendant's Motion to Dismiss, Alternatively Motion for Summary Judgment (doc. 10), plaintiff's Motion to Amend Complaint (doc. 16), plaintiff's Motion for Leave to File Reply (doc. 20), and defendant's Motion to Strike (doc. 25). The Motions have been extensively briefed and are ripe for disposition.

**I.    Nature of the Action.**

On November 6, 2009, plaintiff, N-Tron Corporation, filed a Complaint (doc. 1) against defendant, Rockwell Automation, Inc., in this District Court.  Subject matter jurisdiction was predicated on 28 U.S.C. § 1332, and was bolstered by allegations that N-Tron and Rockwell are citizens of different states, and that the amount in controversy exceeds $34 million.

According to the well-pleaded allegations of the Complaint, which are accepted as true for purposes of defendant's Rule 12(b)(6) motion,[1] the parties entered into a contract styled "Encompass Memorandum of Membership" (hereinafter, "MoM") in September 2002, for the purpose of facilitating cooperative marketing efforts for their complementary product lines.  N-Tron's membership in the Encompass Program related to its EtherNet/IP switches, which enable

---

[1]       *See, e.g., Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (on Rule 12(b)(6) motion, "the court construes the complaint in the light most favorable to the plaintiff and accepts all well-pled facts alleged ... in the complaint as true"); *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) ("In reviewing a complaint, we accept all well-pleaded factual allegations as true and construe the facts in the light most favorable to the plaintiff.").

efficient communication between process control and other industrial automation computer networks.  Prior to entering into the MoM, and at various times thereafter spanning a period of several years, N-Tron sought and received express assurances from Rockwell that Rockwell had no intention of developing its own EtherNet/IP switch products.  In reliance on those assurances, N-Tron executed the MoM, joined and participated in Rockwell's Encompass Program, and renewed its annual membership for five years.  Pursuant to that membership, N-Tron promoted Rockwell's products, trained Rockwell sales personnel on the marketing of EtherNet/IP switches, and educated Rockwell about EtherNet/IP products and markets.  N-Tron alleges, however, that Rockwell was secretly developing its own line of EtherNet/IP products during this time period.  Rockwell unveiled its competing products in November 2007, shortly after it unilaterally terminated N-Tron's membership in the Encompass Program.  Beginning in November 2007, N-Tron maintains, Rockwell notified its customers that it expected them to transition fully to the Rockwell EtherNet/IP products, and began pressuring distributors to stop selling N-Tron products, even where those distributors had established contracts or ongoing business arrangements with N-Tron.

On the strength of these factual allegations, N-Tron's Complaint levels causes of action against Rockwell for breach of contract (on the theory that Rockwell's conduct amounted to a breach of the terms of the MoM), fraudulent misrepresentation (based on Rockwell's alleged false statements to N-Tron as to its intentions to develop and market Ethernet/IP switch products), deceit and fraudulent nondisclosure of Rockwell's development of competing products, tortious interference with contract (on the theory that Rockwell knowingly and intentionally interfered with N-Tron's contracts with its distributors in an attempt to induce the distributors to breach those contracts), and tortious interference with business relationships (relating to Rockwell's alleged efforts to induce distributors to terminate business relationships with N-Tron).  As to each of these causes of action, N-Tron seeks to recover compensatory damages in the amount of $34,768,000.

**II.      Plaintiff's Motion to Amend Complaint.**[2]

On January 12, 2010, just over three weeks after Rockwell moved to dismiss the Complaint, N-Tron filed its Motion to Amend Complaint.  The proposed First Amended Complaint would modify N-Tron's pleading by deleting the breach of contract count, deleting references to the MoM, and adding language to differentiate N-Tron's distributor contracts and business relationships from its participation in the Encompass Program.  By all appearances, this Motion to Amend was a direct reaction to Rockwell's Motion to Dismiss; after all, the Motion to Dismiss is rooted in N-Tron's non-compliance with the dispute resolution clause set forth in the MoM.  By sanitizing their pleading of references to the MoM and claims directly concerning same, and by further alleging that the business relationships and contacts with which Rockwell interfered had nothing to do with the MoM or the Encompass Program, N-Tron seeks to distance its causes of action against Rockwell from the requirements of the dispute resolution clause.

Under the recently amended Rule 15(a), Fed.R.Civ.P., N-Tron was entitled to "amend its pleading once as a matter of course within ... 21 days after service of a motion under Rule 12(b)."  Rule 15(a)(1)(B).  Rockwell's Rule 12(b) motion was filed on December 21, 2009; therefore, the 21-day period for amendment as of right expired on January 11, 2010.  Plaintiff did not file its Motion to Amend until January 12.  As such, N-Tron admits that it cannot amend its Complaint as a matter of course under Rule 15(a)(1), and that its Motion is instead governed by Rule 15(a)(2).[3]  That rule continues to authorize amendment of the pleadings after the Rule 15(a)(1) deadlines "only with the opposing party's written consent or the court's leave."  Rule

---

[2]        Although several motions are pending, N-Tron's Motion to Amend Complaint is logically considered first, to ensure that the Motion to Dismiss will not be evaluated with respect to a superseded pleading.  Also, while the relevant briefing Order (doc. 18) did not allow for reply briefs, plaintiff submitted a Motion for Leave of Court to File Reply (doc. 20), along with a concise two-page proposed reply in support of its request for leave to amend the pleadings.  In its discretion, the Court **grants** the Motion for Leave of Court to File Reply, and will consider the proposed reply appended to that Motion as Exhibit A, without the need for N-Tron to refile it.

[3]        Plaintiff has not invoked Rule 6(d), and the Court will not consider *sua sponte* the impact of that rule on the timeliness of plaintiff's proposed amendment.

15(a)(2).  Rockwell has not provided such written consent here.[4]  Accordingly, the amendment is permissible only with leave of court.

The plain language of the rule provides that "a court should freely give leave when justice so requires."  Rule 15(a)(2).[5]  Notwithstanding this liberal standard, courts have properly denied leave to amend in the presence of circumstances such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment."  *Equity Lifestyle Properties, Inc. v. Florida Mowing and Landscape Service, Inc.*, 556 F.3d 1232, 1241 (11th Cir. 2009) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *see also Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1218 (11th Cir. 2004) (explaining that despite "freely given" language of Rule 15(a), leave to amend may be denied on such grounds as undue delay, undue prejudice, and futility).

Rockwell has filed a Response opposing the proposed amendment; however, its grounds for opposition are difficult to discern.  After all, N-Tron is proposing to withdraw one of its causes of action, a course of conduct that would narrow the lawsuit and reduce the breadth of claims against which Rockwell must defend itself.  On its face, this modification would redound to Rockwell's benefit, and surely would not work any material prejudice.  Defendant does not

---

[4]    Counsel spar on the consent issue, with Rockwell suggesting that N-Tron somehow mischaracterized defense counsel's position in the Motion to Amend Complaint.  It does not appear that any impropriety occurred, although plaintiff's counsel could have worded Paragraph 4 of its Motion with greater precision to minimize any risk of misunderstanding.  But the Court need not delve into the minutiae of counsel's interactions on this point, inasmuch as it is quite clear that Rockwell has never furnished written consent to the proposed amendment, as required by Rule 15(a)(2) to effectuate amendment without leave of court.

[5]    *See also Community State Bank v. Strong*, 485 F.3d 597, 611 n.19 (11th Cir. 2007) ("the rule contemplates that leave shall be granted unless there is a substantial reason to deny it");  *Florida Evergreen Foliage v. E.I. DuPont De Nemours and Co.*, 470 F.3d 1036, 1041 (11th Cir. 2006) ("Unless a substantial reason exists to deny leave to amend, the discretion of the District Court is not broad enough to permit denial.") (citation omitted); *Spanish Broadcasting System of Fla., Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1077 (11th Cir. 2004) ("leave to amend must be granted absent a specific, significant reason for denial").

suggest otherwise.  At most, Rockwell reiterates arguments from its Motion to Dismiss that N-Tron filed this lawsuit in violation of the MoM's dispute resolution clause, but it offers no explanation for how that contention figures into a Rule 15(a)(2) analysis or cuts against the requested amendment.  Rockwell does not allege that N-Tron unduly delayed in seeking leave to amend, that N-Tron's request is animated by bad faith or dilatory motive, that N-Tron has amended the pleadings previously, that Rockwell will suffer prejudice if the amendment is allowed, or that the proposed amendment is futile.  Simply put, Rockwell has not proffered any sound reason why the interests of justice might militate against granting N-Tron leave to amend its Complaint in the requested manner under the liberal standard of Rule 15(a)(2).

For all of the foregoing reasons, the Motion to Amend Complaint (doc. 16) is **granted**. Pursuant to Section II.A.6. of this District Court's Administrative Procedures for Filing, Signing and Verifying Documents by Electronic Means, N-Tron is **ordered**, on or before **February 24, 2010**, to file as a freestanding pleading its First Amended Complaint, in substantially the same form as the proposed amended pleading appended to the Motion as Attachment A.

### III.    Defendant's Motion to Dismiss.

The Court now turns to Rockwell's Motion to Dismiss, or alternatively Motion for Summary Judgment, filed pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[6]  Rockwell contends that N-Tron failed to comply with the dispute resolution

---

[6]    Before delving into the merits of the Motion, a pair of points about briefing are in order.  First, the Court observes that the footnotes found in both sides' briefs utilize a microscopic font that is markedly smaller than the font in the body of the briefs.  The parties are reminded that Local Rule 5.1(a) requires that typed matter be submitted in 12-point type, or larger.  No allowances or exceptions are created for footnotes; therefore, it is expected that footnotes likewise comport with the 12-point standard.  Otherwise, parties could circumvent established page limitations by simply shrinking footnote font sizes.  Second, the relevant briefing Order (doc. 23) provided that briefing on the Motion to Dismiss would close on January 26, 2010, with the filing of defendant's reply brief, and that the Motion would be taken under submission on that date.  Notwithstanding this schedule, plaintiff filed an unauthorized sur-reply (doc. 26) on February 2, 2010, without requesting leave of court.  (That N-Tron combined its sur-reply on the Motion to Dismiss with a permissible opposition brief on the Motion to Strike does not cure this defect.)  Parties are not free to continue filing memoranda at will after the close of a briefing schedule and after the matter has been taken under submission; rather, they may do so only with the Court's permission.  N-Tron failed to obtain such authorization before submitting its 13-page sur-reply.  And of course, sending an e-mail to judicial staff members to

provision set forth in the MoM, and that such omission divests this Court of subject matter jurisdiction.  Alternatively, Rockwell asserts that even if jurisdiction lies, N-Tron's failure to satisfy the dispute resolution provision prior to initiating this lawsuit necessitates its dismissal for failure to state a claim.  Because N-Tron has been granted leave to amend its pleading, the Motion to Dismiss will be evaluated by reference to the First Amended Complaint (as found at doc. 16, Attachment A), rather than the now-superseded original Complaint.

> **A.     Relevant Facts.**

The salient facts presented by the parties are both straightforward and uncontested.  First, both sides agree that all iterations of the MoM entered into between N-Tron and Rockwell included a dispute resolution provision which stated as follows:

> "The parties will attempt in good faith to resolve any dispute arising out of Member's membership in the Program by negotiations between representatives who have authority to settle the controversy.  If unsuccessful, the parties further will attempt in good faith to settle the dispute by non-binding third-party mediation, with fees and expenses of such mediation apportioned equally to each side.  Any dispute not so resolved by negotiation or mediation may then be submitted to a court of competent jurisdiction in accordance with the terms of this MoM.  These procedures are the exclusive procedures for the resolution of all such disputes between the parties."

(Doc. 11, Exh. A, at 2, 5, 8, 11, 14.)

Second, it is undisputed that "[p]rior to commencing this litigation, N-Tron made no effort to conduct negotiations or mediation as agreed to under the ... Memorandums of Membership."  (Nandi Decl., at ¶ 1.)  N-Tron has expressly agreed to this fact, and has acknowledged that the first time it notified Rockwell of this dispute was in connection with service of process in this action.  (Doc. 17, at 2.)[7]

––––––––––––––––––––

apprise them that a sur-reply is in the works is not a viable substitute for applying for leave of court to file that sur-reply.  In its discretion, the Court will consider these non-conforming materials; however, future filings that deviate from proper formatting requirements and briefing protocols may be stricken.

[7]     Neither the MoM nor the Declaration of Melissa Nandi are attached to the First Amended Complaint, and that pleading does not reference either the dispute resolution provision or N-Tron's admitted non-compliance with same.  "Ordinarily, we do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to

**B.      Rule 12(b)(1).**

As an initial matter, Rockwell asserts that N-Tron's failure to comply with the MoM's dispute resolution clause before filing suit strips this Court of subject matter jurisdiction and mandates dismissal of this action without prejudice pursuant to Rule 12(b)(1).  As Rockwell phrases it, "negotiation and mediation are conditions precedent to filing a lawsuit and N-Tron's failure to do so renders this Court without subject matter jurisdiction."  (Doc. 11, at 7.)

The fundamental problem with defendant's Rule 12(b)(1) argument is that it conflates non-performance of a contractual condition precedent with deprivation of subject matter jurisdiction.  There is no question that the failure to satisfy a condition precedent to suit under a contract may negate a party's ability to recover damages.[8]  But federal courts have held in a

---

dismiss."  *Financial Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007); *McElmurray v. Consolidated Government of Augusta-Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007) (characterizing limitation as a "safeguard" for plaintiffs); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (proscription on consideration of extrinsic materials in Rule 12(b) motions prevents "the circumvention of the Rule 56 notice and opportunity to be heard provisions").  Nonetheless, consideration of these facts is appropriate, notwithstanding their extrinsic nature, because Rockwell has raised a "factual" jurisdictional challenge under Rule 12(b)(1).  *See, e.g., Sinaltrainal*, 578 F.3d at 1260 (in the 12(b)(1) context, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered") (citation and internal quotation marks omitted).  The Court will also consider these facts for purposes of Rockwell's Rule 12(b)(6) motion because N-Tron (the party whom the restriction on extrinsic materials was designed to protect) has expressly stipulated to their veracity and has asked that the Court resolve these issues now.  *See* doc. 17, at 2 ("The factual assertions ... are not disputed, and, therefore, the issues postured by Rockwell in its motions are questions of law for this Court.").  In light of N-Tron's urging this Court to address these legal issues based on the stipulated facts of the terms of the dispute resolution provision and N-Tron's noncompliance with same, no further notice or opportunity to be heard must be furnished to N-Tron before those limited extrinsic matters may be considered.  To the extent that it is or may be error for this Court to consider these facts outside the four corners of the Complaint for purposes of the Rule 12(b)(6) motion, it is error that N-Tron has invited.

[8]      *See, e.g., Mullins v. TestAmerica, Inc.*, 564 F.3d 386 (5th Cir. 2009) ("A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation.") (citation omitted); *TSC Research, LLC v. Bayer Chemicals Corp.*, 552 F. Supp.2d 534, 539 (M.D.N.C. 2008) ("Agreements containing an unmet condition precedent are also unenforceable.").

variety of contexts that the question of subject matter jurisdiction is analytically distinct from that of failure to satisfy conditions precedent to suit. *See, e.g., Griffin v. Dugger*, 823 F.2d 1476, 1482 n.12 (11th Cir. 1987) (in Title VII context, a plaintiff's "failure to satisfy the conditions precedent [to filing suit] does not, standing alone, deprive federal district courts of subject matter jurisdiction"); *Harris v. Amoco Production Co.*, 768 F.2d 669, 680 (5th Cir. 1985) ("while the failure to comply with a condition precedent usually means that a plaintiff cannot bring suit ..., it does not mean that the district court lacks subject matter jurisdiction if the case is otherwise before it"); *Nova Design Build, Inc. v. Grace Hotels, LLC*, 2008 WL 4450305 (N.D. Ill. Sept. 30, 2008) (in copyright context, distinguishing between conditions precedent to suit and subject matter jurisdiction); *Batesville Services, Inc. v. Funeral Depot, Inc.*, 2004 WL 2750253, *3 (S.D. Ind. Nov. 10, 2004) ("In general, whether a condition precedent has been satisfied does not affect the court's subject matter jurisdiction in the strong sense of that term.").

To be sure, Rockwell has offered a handful of (mostly unpublished) authorities that have deemed a party's failure to satisfy a contractual dispute resolution clause to be an omission of jurisdictional proportions.  These decisions are symptomatic of the widespread epidemic of fuzzy, shorthand, imprecise and variegated usage of the term "jurisdiction" by courts, litigants and commentators, a propensity that the Supreme Court and Courts of Appeals have recognized (and lamented) on numerous occasions.  *See, e.g., Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007) ("It is true enough that the word 'jurisdiction' does not in every context connote subject-matter jurisdiction."); *International Union of Operating Engineers, Local 150, AFL-CIO v. Rabine*, 161 F.3d 427, 430 (7th Cir. 1998) ("[j]urisdiction is a many-hued term, and its use does not always mark a case as beyond our reach") (citation and internal quotation marks omitted); *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996) ("Jurisdiction is a word of many, too many, meanings.").  When lawyers bandy about the term "jurisdiction," a rose is not necessarily a rose.

In its strict sense, however, "jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (citation omitted); *see also Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 79 (3rd Cir. 2003) ("courts normally should not conflate subject matter jurisdiction with elements of an

action's merits"); *Davoll v. Webb*, 194 F.3d 1116, 1128 n.3 (10th Cir. 1999) ("the difference between a question of subject matter jurisdiction and one of failure to state a claim is a lesson that has been taught as often in decision as it has been ignored in argument and dicta," and "courts should carefully consider whether a dismissal is truly jurisdictional") (citations and internal quotation marks omitted).  "Not all mandatory prescriptions, however emphatic, are ... properly typed jurisdictional ....  Subject-matter jurisdiction properly comprehended ... refers to a tribunal's power to hear a case, a matter that can never be forfeited or waived."  *Union Pacific R. Co. v. Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment, Cent. Region*, --- U.S. ----, 130 S.Ct. 584, 596 (2009) (citations and internal quotation marks omitted).

Viewed through the prism of those governing principles, it is abundantly clear that N-Tron's admitted non-compliance with the mandatory dispute resolution procedures embodied in the MoM does not implicate jurisdictional concerns.  Federal subject matter jurisdiction properly lies in this case pursuant to 28 U.S.C. § 1332, given that N-Tron and Rockwell are of diverse citizenship and the amount in controversy vastly exceeds the $75,000 statutory floor.  The Court is therefore empowered to hear this case.  As for the dispute resolution clause, Rockwell could have waived or forfeited it.  As such, it is plainly not of jurisdictional import.  Stated differently, while N-Tron's failure to abide by the agreed-upon pre-suit dispute resolution procedures may prove fatal to its claims on the merits and support a finding that the First Amended Complaint fails to state a claim on which relief can be granted, it does not impinge upon this Court's power to hear the case.

For all of the foregoing reasons, defendant's Motion to Dismiss is **denied** insofar as it is brought pursuant to Rule 12(b)(1).  Subject matter jurisdiction properly lies here.

C.      *Rule 12(b)(6).*

In the alternative, Rockwell seeks dismissal of the First Amended Complaint for failure to state a claim upon which relief can be granted.  The crux of this Rule 12(b)(6) theory is that N-Tron's failure to comply with the contractual dispute resolution requirements precludes it from seeking relief here and requires the dismissal of all claims.

1.      *Counts I and II are Subject to the Dispute Resolution Provision.*

It is undisputed that the MoM contracts that N-Tron executed in each year of its

membership in Rockwell's Encompass Program included a mandatory, exclusive dispute resolution provision.  It is further undisputed that such a provision is valid and enforceable under Wisconsin law.[9]  *See, e.g., Omni Tech Corp. v. MPC Solutions Sales, LLC*, 432 F.3d 797, 799 (7th Cir. 2005) ("what matters is that Wisconsin respects the parties' ability to make agreements of this kind"); *Wisconsin Auto Title Loans, Inc. v. Jones*, 696 N.W.2d 214, 219 (Wis. App. 2005) (in gauging validity of arbitration clause, "the usual defenses to a contract such as fraud, unconscionability, duress and lack of consideration may be applied"); *see generally Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc.*, 524 F.3d 1235, 1241 (11th Cir. 2008) (recognizing that agreements to mediate "might be specifically enforceable in contract or under other law").[10]  The parties' areas of disagreement over the Rule 12(b)(6) Motion concern whether N-Tron's claims lie within the scope of the dispute resolution provision and, if so, whether dismissal is the appropriate remedy.  The Court will consider each of these issues in turn.

On its face, N-Tron's contractual obligation to participate in negotiation and mediation with Rockwell applies to "any dispute arising out of Member's membership in the Program."  Although the parties devote considerable effort to debating whether this language is "broad" or "narrow" in some normative way, its construction is actually quite straightforward.[11]  Under

---

[9]      Wisconsin law governs the construction and enforcement of the dispute resolution clause because the MoM included a choice of law provision stating that "[t]his MOM, the Program and all disputes arising thereunder will be governed by and interpreted in accordance with the internal laws of the State of Wisconsin."  (Doc. 11, Exh. A, at 2, 5, 8, 11, 14.)

[10]     Mediation provisions are favored in the law.  As the Eleventh Circuit has opined, "We encourage parties to make liberal use of [mediation], and we encourage district courts to liberally employ any authority they have under local rules to order mediation *sua sponte* when doing so may expedite the resolution of a case."  *Advanced Bodycare*, 524 F.3d at 1241.

[11]     For all of N-Tron's insistence that "arising out of" is narrow language, Wisconsin courts have repeatedly indicated otherwise in a variety of contexts.  *See, e.g., Mikula v. Miller Brewing Co.*, 701 N.W.2d 613, 620 (Wis.App. 2005) ("The phrase 'arising out of' has been construed broadly - commonly understood to mean originating from, growing out of, or flowing from ....") (citation and internal quotation marks omitted); *see also Littrall v. Indemnity Ins. Co. of North America*, 300 F.2d 340, 344 (7th Cir. 1962) ("It must be admitted that 'arising out of' is a very broad phrase."); *Pretasky v. MarineMax, Inc.*, 2002 WL 32345612, *2 (W.D. Wis. Mar. 7, 2002) ("An arbitration provision that extends to 'all disputes arising out of the agreement' is a broad one.").  N-Tron's point – that the clause would have been even broader had Rockwell

-10-

Wisconsin law, "[i]n ascertaining the intent of the parties, contract terms should be given their plain or ordinary meaning." *Huml v. Vlazny*, 716 N.W.2d 807, 820 (Wis. 2006); *see also Steinmann v. Steinmann*, 749 N.W.2d 145, 153 (Wis. 2008) ("When the language of a contract is unambiguous, we will apply its literal meaning."); *Raasch v. City of Milwaukee*, 750 N.W.2d 492, 497 (Wis. App. 2008) ("In construing the terms of a contract, where the terms are plain and unambiguous, it is the duty of the court to construe it as it stands, even though the parties may have placed a different construction on it.") (citation omitted). The relevant contract language in this case is unambiguous; therefore, extrinsic evidence may not be utilized to gauge the parties' intent. *See Huml*, 716 N.W.2d at 820 (citations omitted) ("Absent ambiguity, it is improper to consider extrinsic evidence of intent.") (citations omitted).[12]

Under the relevant contract provision, N-Tron had agreed to negotiate and mediate any dispute "arising out of" its membership in the Encompass Program. The plain, ordinary meaning of "arising out of" equates to such concepts as "originating from, growing out of, or flowing from." Thus, the question is whether N-Tron's claims in the First Amended Complaint originate from, grow out of, or flow from its membership in the Encompass Program. If so, then the condition precedent of the dispute resolution provision is in play, N-Tron is in breach of same, and Rockwell is entitled to relief. If not, then the condition precedent is inapplicable and poses

---

added the phrase "or related to" to it – is really *a propos* of nothing. Nor is it illuminating for N-Tron to suggest that interpretation of the relevant contract language is governed by authorities construing dispute resolution provisions that apply to disputes "arising out of" a contract. (Doc. 17, at 7-10; doc. 26, at 5-6.) After all, the relevant provision in this case requires negotiation and mediation not of disputes arising out of the MoM, but of disputes arising out of N-Tron's membership in the Encompass Program. N-Tron's argument largely glosses over this significant distinction.

[12]    For that reason, the Court does not consider the portions of the Declaration of Warren Nicholson (the President of N-Tron), wherein he explains his intent with respect to the dispute resolution clause (*i.e.*, this clause "was never envisioned by me to encompass the types of claims that my company has had to file in this litigation"). (Doc. 17, Exh. A.) In the face of unambiguous contract language, such extrinsic evidence of intent is improper under Wisconsin law.

-11-

no obstacle to this litigation moving forward immediately.[13]

Careful scrutiny of the First Amended Complaint reveals that at least certain of N-Tron's causes of action are firmly rooted in its membership in the Encompass Program.  All references to the MoM have been stripped from the "Facts" section of the First Amended Complaint, but it nonetheless describes the Encompass Program, and N-Tron's membership in and termination from it, in considerable detail.  (*See* doc. 16, Exh. A, at ¶¶ 8-10, 12-13, 15, 17.)  In the fraudulent misrepresentation cause of action (Count I), N-Tron alleges that Rockwell misrepresented facts to induce N-Tron "to contribute money to the Program, to contribute valued resources to the Program, and to remain in the Program."  (*Id.* at ¶ 25.)  In that same cause of action, N-Tron claims as damages "the amount of money that N-Tron was fraudulently induced into investing in the Program and ... the value of the services that N-Tron provided ... in connection with its training of Rockwell personnel" pursuant to the Program.  (*Id.* at ¶ 27.)  Similarly, N-Tron alleges in its deceit / fraudulent failure to disclose claim (Count II) that Rockwell had a duty to disclose its competitive ambitions "at all times during N-Tron's participation in the Program," and that N-Tron "would have discontinued its participation in the Program immediately" had such disclosure taken place.  (*Id.* at ¶ 29.)  The First Amended Complaint pleads that Rockwell's course of conduct deceived N-Tron "into participating in, and remaining in, the Program and, during that time, investing money, resources, and time into the Program."  (*Id.*)

Unquestionably, there is a close nexus between Counts I and II and N-Tron's membership in the Encompass Program.  Indeed, N-Tron is claiming that it is only because of Rockwell's misrepresentations and deceit that N-Tron joined the Program at all, and that it remained a member only because of those continuing misrepresentations and nondisclosures.  N-

---

[13]     Throughout its memoranda, N-Tron insists that "[a] core point to remember is that N-Tron is making no claims regarding the terms of the contract nor is it making any claims that Rockwell breached the contract."  (Doc. 26, at 4.)  This characterization of the First Amended Complaint is accurate, but it is also of little consequence.  Again, the condition precedent is phrased as applying to disputes arising out of N-Tron's membership in the Encompass Program, not disputes arising out of the contract.  Whether N-Tron's claims against Rockwell allege breach of the MoM is really beside the point; rather, the appropriate inquiry is whether those claims arise from N-Tron's membership in the Program.  N-Tron's arguments thus traverse a dead-end trail that diverges from the issues properly presented by Rockwell's Motion to Dismiss.

Tron seeks to recover as damages from Rockwell the funds it invested as a member of the Program, as well as the value of services it provided to Rockwell as a member of the Program. Simply put, the harm that N-Tron ascribes to Rockwell's alleged tortious conduct is N-Tron's membership and participation in the Program. Under any rational construction, then, the dispute embodied in Counts I and II arises out of (*i.e.*, originates from, grows out of, or flows from) N-Tron's membership in the Encompass Program because N-Tron seeks recovery from Rockwell for damages incurred pursuant to (and solely by virtue of) its membership and participation in the Program. As such, Counts I and II of the First Amended Complaint fall within the plain, ordinary meaning of the unambiguous language of the MoM's mandatory dispute resolution provision. The corollary to this determination is that N-Tron, by pursuing Counts I and II against Rockwell without first engaging in the mandatory negotiation and mediation procedures prescribed by the contract, has failed to perform a condition precedent to suit.[14]

---

[14] It bears noting, however, that Counts III and IV of the First Amended Complaint are on a different analytical footing vis a vis the dispute resolution clause. In Count III, N-Tron alleges that Rockwell interfered with N-Tron's separate contracts with its distributors in an attempt to induce the distributors to breach them. (Doc. 16, Exh. A, at ¶ 34.) In Count IV, N-Tron alleges that Rockwell interfered with N-Tron's business relationships with its distributors in an effort to induce the distributors to terminate those relationships. (*Id.* at ¶ 38.) Although it is a self-serving statement made to combat Rockwell's Motion to Dismiss, the First Amended Complaint specifically alleges that these "contracts, distribution arrangements, and business relationships [between N-Tron and its distributors] were separate aspects of N-Tron's business and were, therefore, totally unrelated to N-Tron's then-terminated participation in Rockwell's Encompass Program." (*Id.* at ¶ 22.) So the gravamen of Counts III and IV is that, <u>following</u> N-Tron's termination from the Program, Rockwell began meddling in N-Tron's separate relationships with its distributors. Rockwell makes the irrelevant observation that N-Tron has not identified the distributors with whom Rockwell allegedly interfered, but it does not articulate any persuasive argument that Counts III and IV "arise out of" N-Tron's membership in the Program, so as to lie within the ambit of the dispute resolution provision. The Court finds that these claims clearly are not subject to the dispute resolution clause. The alleged interference happened after N-Tron's membership in the Program was terminated, involved business relationships that were entirely separate from the Program, and was in no way predicated on or rooted in N-Tron's prior involvement in the Program. As such, the dispute embodied in Counts III and IV has nothing to do with N-Tron's membership in the Program, and N-Tron did not violate any condition precedent by suing Rockwell on Counts III and IV without first submitting those claims to negotiation and mediation.

       2.      *Remedy for Plaintiff's Non-Performance of Condition Precedent.*

The final question presented by the Motion to Dismiss concerns the appropriate remedy for N-Tron's failure to comply with the dispute resolution provision as to Counts I and II before filing suit. Rockwell requests that the Complaint be dismissed without prejudice, even though the practical effect of such dismissal would be to foreclose N-Tron from ever re-asserting those tort claims because the applicable statute of limitations has expired in the interim. By contrast, N-Tron proposes that this action be stayed and the parties be ordered to submit to mediation, with N-Tron vowing that it "will most certainly mediate in good faith." (Doc. 17, at 17.)

N-Tron has the better argument. When confronted with objections that plaintiffs have initiated litigation without satisfying arbitration or mediation requirements, courts routinely stay rather than dismiss the proceedings to allow for implementation of the agreed-upon dispute resolution mechanism. *See, e.g., Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 561 (7th Cir. 2008) ("the proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings rather than to dismiss outright") (citations omitted).[15] It is true, of course, that examples in the case law do exist wherein actions have been dismissed for non-

---

[15]    *See also Omni Tech*, 432 F.3d at 800 (where the parties had entered into an alternative dispute resolution provision, "the suit should have been stayed" pending ADR proceedings); *Tracfone Wireless, Inc. v. Blue Ocean's Distributing, LLC*, 616 F. Supp.2d 1284, 1285 (S.D. Fla. 2009) (proper remedy for party's failure to comply with arbitration provision was stay, rather than dismissal, where party had requested stay); *R&F, LLC v. Brooke Corp.*, 2008 WL 294517, *2 (D. Kan. Jan. 31, 2008) (where plaintiff filed suit despite provision requiring parties to engage in mediation before going to court, proper remedy was to stay the litigation pending mediation); *Scurtu v. International Student Exchange*, 523 F. Supp.2d 1313, 1328 (S.D. Ala. 2007) (electing to stay, rather than dismiss, plaintiff's claims that were subject to binding arbitration agreement); *RoadTechs, Inc. v. MJ Highway Technology, Ltd.*, 79 F. Supp.2d 637, 640 (E.D. Va. 2000) ("it is within the district court's discretion whether to dismiss or stay an action after referring it to arbitration"); *Cecala v. Moore*, 982 F. Supp. 609, 613 (N.D. Ill. 1997) ("if the dispute at issue is found to arise out of or relate to the instant contract and so to be within the scope of the mediation clause, then this court concludes that it has the authority to stay the proceedings"); *Schulz v. Nienhuis*, 448 N.W.2d 655, 656 (Wis. 1989) (where plaintiff failed to participate in mediation as prescribed by state statute before filing suit, dismissal is not required, and circuit court may determine appropriate remedy).

compliance with dispute resolution provisions.[16]  But that course of action is not mandatory; rather, district courts are vested with discretion to determine whether stay or dismissal is appropriate.

In that vein, it is beyond cavil that "[t]he District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."  *Clinton v. Jones*, 520 U.S. 681, 706, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); *see also Ortega Trujillo v. Conover & Co. Communications, Inc.*, 221 F.3d 1262, 1264 (11th Cir. 2000) ("A stay sometimes is authorized simply as a means of controlling the district court's docket and of managing cases before the district court."); *Dominguez v. Hartford Financial Services Group, Inc.*, 530 F. Supp.2d 902, 905 (S.D. Tex. 2008) ("The stay of a pending matter is ordinarily within the trial court's wide discretion to control the course of litigation ...."); *Utah v. Eli Lilly and Co.*, 509 F. Supp.2d 1016, 1019 (D. Utah 2007) (recognizing discretion to stay proceedings to save time and effort for parties and court).  "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."  *Landis v. North American Co.*, 299 U.S. 248, 254-55, 57 S.Ct. 163, 81 L.Ed. 153 (1936).  Thus, in determining whether a stay is appropriate in a particular case, "the court, in its sound discretion, must assess and balance the nature and substantiality of the injustices claimed on either side."  *Feld Entertainment, Inc. v. A.S.P.C.A.*, 523 F. Supp.2d 1, 3 (D.D.C. 2007) (citations omitted).   The Eleventh Circuit has observed that "district courts have inherent, discretionary authority to issue stays in many circumstances, and ***granting a stay to permit mediation (or to require it) will***

---

[16]        *See, e.g., 3-J Hospitality, LLC v. Big Time Design, Inc.*, 2009 WL 3586830, *2 (S.D. Fla. Oct. 27, 2009) ("Where the parties' agreement requires mediation as a condition precedent to arbitration or litigation [and no such mediation has taken place], the complaint must be dismissed."); *Brosnan v. Dry Cleaning Station Inc.*, 2008 WL 2388392, *1 (N.D. Cal. June 6, 2008) ("Failure to mediate a dispute pursuant to a contract that makes mediation a condition precedent to filing a lawsuit warrants dismissal."); *Darling's v. Nissan North America, Inc.*, 117 F. Supp.2d 54, 61 (D. Me. 2000) (where statute required plaintiff to make written demand for nonbinding mediation before filing suit, and plaintiff did not comply, proper remedy was to dismiss claim without prejudice, allowing plaintiff to refile upon fulfilling mediation requirement).

*often be appropriate*." *Advanced Bodycare*, 524 F.3d at 1241 (footnote omitted & emphasis added).

Here, granting a stay to require N-Tron and Rockwell to negotiate and mediate in good faith concerning Counts I and II is a more appropriate remedy than dismissal without prejudice for three reasons. First, the harm to N-Tron of not granting a stay would be considerable, inasmuch as a dismissal without prejudice would be tantamount to a dismissal with prejudice, effectively barring it from ever litigating its fraud and deceit claims against Rockwell because of the now-expired limitations period. Second, the harm to Rockwell of staying these claims, rather than dismissing them, is negligible. Rockwell is entitled to insist on performance of the condition precedent before this lawsuit goes forward, and staying this action for a discrete period of time to require negotiation and mediation pursuant to the MoM would place Rockwell in precisely the same bargained-for position it would have occupied had N-Tron complied with the dispute resolution clause before filing suit in the first place. There is no perceptible prejudice to Rockwell, and it has not argued otherwise. Third, it bears emphasis that only Counts I and II trigger the dispute resolution provision. Counts III and IV do not. By staying the entire action to allow for submission of Counts I and II to the contractual mediation mechanism, the Court ensures that all four causes of action will be litigated together in a single proceeding if mediation of Counts I and II should fail, rather than being inefficiently splintered across multiple proceedings at differing stages of the litigation process.

In light of these considerations, including the balancing of the harms and the Eleventh Circuit's express recognition of the propriety of granting stays to permit or require mediation, the Court will not dismiss Counts I and II without prejudice based on N-Tron's failure to submit them to agreed-upon pre-suit dispute resolution mechanisms. Instead, the Court will stay this action in its entirety for a reasonable period of time to enable the parties to conduct negotiation and mediation on those counts.[17]

---

[17]     Rockwell objects to the stay remedy on the grounds that it would amount to the exercise of "some undefined equity powers to recraft or redraft or otherwise disregard the express terms of the MoMs and the condition precedent of mandatory alternative dispute resolution." (Doc. 24, at 9.) But granting a stay would not rewrite or disregard the contractual terms; to the contrary, it would enforce them by obliging N-Tron to adhere to the agreed-upon

**IV.    Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.      Plaintiff's Motion to Amend Complaint (doc. 16) is **granted.**  N-Tron is **ordered**, on or before **February 24, 2010**, to file as a freestanding pleading its First Amended Complaint, in substantially the same form as the proposed amended pleading appended to the Motion as Attachment A.

2.      Plaintiff's Motion for Leave of Court to File Reply (doc. 20) is **granted**, and the Court has considered the proposed reply brief appended to that Motion as if it had been filed as a separate document.

3.      Defendant's Motion to Dismiss, Alternatively Motion for Summary Judgment (doc. 10) is **denied**.

4.      Defendant's Motion to Strike (doc. 25) is **moot** because it is not necessary to consider the averments of the Nicholson Declaration (including specifically averments regarding N-Tron's intent in entering into the contract, N-Tron's self-serving interpretation of the scope of the dispute resolution provision, and N-Tron's belief in the veracity of its assertion in the First Amended Complaint that the distributor relationships addressed in Counts III and IV are totally separate from N-Tron's participation in the Encompass Program) to resolve the pending motions.

5.      Based on the finding that Counts I and II are within the ambit of the mandatory dispute resolution clause contained in the applicable contracts, the parties are **ordered** to negotiate and (if necessary) mediate those claims in good faith in accordance with that agreed-upon provision.  Counts III and IV are not included in this directive because those claims are beyond the scope of the dispute resolution provision; however, nothing herein would forbid or foreclose the parties from engaging in negotiation and/or mediation of those causes of action

---

negotiation and mediation procedures before this litigation moves forward.  As for Rockwell's suggestion that such a stay would flow from "some undefined equity powers," those powers are actually meticulously defined in the case law, as demonstrated by the foregoing discussion.

-17-

contemporaneously with Counts I and II, should they mutually agree to do so.

6.     The Court exercises its broad discretion to control its docket and manage cases by staying this action in its entirety, rather than dismissing Counts I and II without prejudice.  Accordingly, this action is **stayed** for a period of 90 days, through and including **May 19, 2010**, to enable the parties to perform their dispute resolution obligations identified in Paragraph 5, *supra*.  On or before **May 17, 2010**, the parties are **ordered** to file a joint report setting forth the status of their negotiation/mediation efforts.  Given the ample period allotted for the relatively simple dispute resolution procedures identified in the MoM, it is not anticipated that any extension of the stay will be needed to enable the parties to complete those procedures.  The parties are expected to act diligently to implement the contractual dispute resolution mechanism without delay.

7.     Defendant is **ordered** to file an answer within 10 calendar days after the stay is lifted, after which the matter will be referred to Magistrate Judge Cassady for issuance of a Preliminary Scheduling Order.

DONE and ORDERED this 18th day of February, 2010.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE