IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **WNE HOLDINGS CORPORATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CIVIL ACTION 09-0733-WS-C** |
| ) | |
| **ROCKWELL AUTOMATION, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

**ORDER**

This matter comes before the Court on Defendant's Motion for Judgment on the Pleadings (doc. 57). The Motion has been briefed and is now ripe for disposition.[1]

**I.     Relevant Factual and Procedural Background.[2]**

Plaintiff, WNE Holdings Corporation (formerly known as N-Tron Corporation), brought this action against defendant, Rockwell Automation, Inc., asserting causes of action for

---

[1]     Plaintiff's opposition brief incorrectly recites the style of the case by identifying as plaintiffs "N-Tron Corporation and Warren H. Nicholson." (Doc. 63, at 1.) In an Order dated December 30, 2010, the undersigned directed, at plaintiff's request, that "the style of this action is henceforth modified to identify the plaintiff by its new name, 'WNE Holdings Corporation.'" (Doc. 52, at 1 n.1 & 3.) The December 30 Order ordered the parties to modify the style of the case to reflect plaintiff's new name in all subsequent filings. (*Id.*) Yet plaintiff's brief lists N-Tron rather than WNE Holdings as plaintiff. Future filings that do not correctly set forth the style of this action may be stricken *sua sponte* for non-compliance with the December 30 Order. Furthermore, plaintiff's brief lists as a second plaintiff Warren H. Nicholson. That individual is not now and has never been a plaintiff in this action. The Court does not recognize Nicholson as a party plaintiff and may strike any future filings that improperly list him in that capacity without first satisfying applicable Federal Rules of Civil Procedure for amending pleadings and joining parties.

[2]     Because this matter is presented on a Motion for Judgment on the Pleadings, this Court "must accept the facts alleged in the complaint as true and view them in the light most favorable to the nonmoving party." *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001); *see also Cunningham v. District Attorney's Office for Escambia County*, 592 F.3d 1237, 1255 (11th Cir. 2010) (similar).

fraudulent misrepresentations (Count I), deceit and fraudulent failure to disclose (Count II), tortious interference with contract (Count III), and tortious interference with business relationships (Count IV). (*See* doc. 28.)

The First Amended Complaint alleges that WNE was a member of (and actively participated in) Rockwell's Encompass Program (the "Program") from September 2002 through August 2007, for the purpose of facilitating cooperative marketing efforts between the parties concerning complementary product lines, including EtherNet/IP switch products that WNE supplied to Rockwell. According to the First Amended Complaint, WNE inquired prior to joining the Program "if Rockwell had any plans to develop its own EtherNet/IP switch product," and postulated that "if Rockwell had such plans, [WNE] would have never participated in the Program." (Doc. 28, ¶ 11.) The pleading further alleges that WNE repeated this inquiry numerous times throughout its participation in the Program, including prior to each annual renewal of same. (*Id.*) WNE alleges that "[e]ach time [WNE] made such an inquiry, Rockwell personnel falsely and deceptively assured [WNE] that Rockwell had no such plans or interest to enter the Industrial Ethernet switch market." (*Id.*) In reliance on Rockwell's false and deceptive assurances, WNE says, it joined, remained in, and participated in the Program.

Notwithstanding its statements that it was not developing EtherNet/IP switches, Rockwell terminated WNE's involvement in the Program in August 2007, then unveiled its own "complete line of managed and unmanaged Ethernet Switches." (Doc. 28, ¶ 18.) According to the First Amended Complaint, Rockwell made false and misleading representations, and pressured distributors to stop selling WNE products, all with the intention and effect of interfering with WNE's contracts, agreements and business relationships with such distributors. (*Id.*, ¶¶ 19-24.) Those allegations form the backbone of Counts III and IV, which are not at issue in defendant's Rule 12(c) Motion.

The gravamen of Counts I and II is that WNE relied to its detriment on Rockwell's fraudulent misrepresentations concerning its designs to make and market EtherNet/IP switches that compete with WNE's products, and that Rockwell breached a duty to disclose those intentions as well as its efforts to develop competing products. Plaintiff maintains that Rockwell's misrepresentations "fraudulently induced [it] into investing in the Program," and training Rockwell personnel as to such products via the Program, and that plaintiff "would never

have become involved in the Program and would have discontinued its participation in the Program immediately upon learning the true information." (Doc. 28, ¶¶ 27, 29.)

Upon being served with the complaint, Rockwell filed a Motion to Dismiss (doc. 10) back in December 2009, on grounds of lack of subject-matter jurisdiction and failure to state a claim on which relief can be granted. The basis of that Motion was that WNE had failed to comply with mandatory dispute resolution provisions set forth in a series of contracts styled "Encompass Memorandum of Membership" ("MoM"), prior to filing suit against Rockwell. In an Order (doc. 27) entered on February 18, 2010, the Court found that "Counts I and II of the First Amended Complaint fall within the plain, ordinary meaning of the unambiguous language of the MoM's mandatory dispute resolution provision." (Doc. 27, at 13.) For that reason, the February 18 Order stayed this action for 90 days to enable the parties to participate in the negotiation and mediation processes set forth in the MoM as a condition precedent to litigation. When those mechanisms failed to bring about a settlement, the stay was lifted by Order (doc. 31) dated May 13, 2010.

More than eight months after the litigation resumed, Rockwell filed its Motion for Judgment on the Pleadings (doc. 57) pursuant to Rule 12(c), Fed.R.Civ.P.[3] Rockwell's position is that Counts I and II (again, the fraudulent misrepresentation and deceit/fraudulent non-disclosure claims) should be dismissed pursuant to the law of the case doctrine and Wisconsin's economic loss rule. WNE opposes the Motion.

---

[3] The timing of the Rule 12(c) Motion is curious. Although Rockwell asserts that "[t]his case has not proceeded far beyond the preliminary stages" (doc. 57, at 3), the record shows otherwise. The Rule 12(b) Motion was decided some 11 months before defendant followed up with a Rule 12(c) Motion ostensibly predicated on the binding effect of the Rule 12(b) ruling. This matter had been restored to the active docket of this District Court for more than eight months before the Rule 12(c) Motion was filed. The Rule 16(b) Scheduling Order was entered fully six months before the Rule 12(c) Motion was filed, and presumably discovery had been moving forward throughout that time period. In short, this action was well past its nascent stage when Rockwell elected to take a second cut at seeking Rule 12 dismissal. Nonetheless, Rockwell's Motion is not untimely. Motions for judgment on the pleadings are authorized so long as they are filed "early enough not to delay trial." Rule 12(c), Fed.R.Civ.P. Whatever its infirmities may be, this Motion satisfies that permissive temporal hurdle.

**II.   Analysis.**

   *A.   Law of the Case Doctrine and the February 18 Order.*

Rockwell's first theory for Rule 12(c) relief is that the law of the case doctrine requires dismissal of Counts I and II. Movant structures this argument as follows: (i) the February 18 Order "found that the terms of the MoM controlled Counts I and II" (doc. 57, at 5); (ii) that Order established the law of the case and governs the same issues for the duration of this action; (iii) the MoM contained a disclaimer provision exempting Rockwell from liability for certain damages arising from WNE's membership in the Program;[4] and (iv) under the law of the case doctrine, Counts I and II are governed by the MoM and therefore by the disclaimer of damages provision, which precludes liability because those claims arise from WNE's membership in the Program.[5]

This ground for seeking judgment on the pleadings is unpersuasive for several reasons. First, as a threshold matter, Rockwell is silent as to the applicable legal standard for a Rule 12(c) motion. In this Circuit, "[j]udgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Cunningham v. District Attorney's Office for*

---

[4]   The exact terms of this provision are found in the MoMs executed by the parties. Although such MoMs are neither attached to nor referenced in the First Amended Complaint, Rockwell has appended copies of them to the Motion for Judgment on the Pleadings as Exhibit A. The disclaimer of damages clause reads as follows: "IN NO EVENT WILL EITHER PARTY BE LIABLE FOR INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OF ANY KIND TO THE EXTENT ARISING DIRECTLY OR INDIRECTLY FROM MEMBER'S MEMBERSHIP OR THE REFERENCED PRODUCT(S) PARTICIPATION IN THE PROGRAM, INCLUDING ANY SUBSEQUENT REMOVAL OR TERMINATION THEREUNDER."  (Doc. 57, Exh. A.)

[5]   Rockwell also invokes a separate provision in the MoMs which states that Rockwell "reserves the right to revise, modify, terminate or withdraw the Program, in whole or in part, at any time and at its sole discretion, without liability of any kind to Member." (Doc. 57, Exh. A.) That paragraph has no apparent bearing on this lawsuit. Counts I and II do not allege that Rockwell is liable for revising, modifying, terminating or withdrawing the Program; rather, they allege that Rockwell is liable for lying to WNE about matters distinct from the Program to induce it to join, participate and invest in the Program under false pretenses. Rockwell having failed to explain how this provision bars liability for Counts I and II, and those causes of action facially addressing different harms than Rockwell's modification or termination of the Program, the Court will not consider this provision further in connection with the Rule 12(c) Motion.

*Escambia County*, 592 F.3d 1237, 1255 (11th Cir. 2010) (citation omitted). The general rule is that "we will not consider matters outside the pleadings when passing on a Rule 12(c) motion for judgment on the pleadings." *Horsley v. Feldt*, 304 F.3d 1125, 1136 n.6 (11th Cir. 2002). The MoMs whose disclaimer of damage provision lies at the heart of Rockwell's Motion are not appended to or incorporated in the pleadings; to the contrary, the First Amended Complaint does not reference the MoMs, does not utilize them as exhibits, and does not include any causes of action alleging breach of the MoMs. So how, then, is the content of the MoM (and particularly the disclaimer clause) properly considered in the context of this Rule 12(c) Motion? Movant does not explain.[6] Rockwell having failed to show how these extrinsic exhibits (which are of critical importance to its request for judgment on the pleadings) may be considered, the Rule 12(c) Motion would be properly denied on that basis alone, without even reaching the merits.

Second, Rockwell's contention that the February 18 Order constitutes the "law of the case" misapplies that doctrine. In this Circuit, it is well-settled that "a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court" and that "law of the case applies only where there has been a final judgment." *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1289 (11th Cir. 2009) (citations omitted).[7] The

---

[6] Two other observations are germane here. While the Court did consider the MoMs in ruling on defendant's previous Motion to Dismiss, the February 18 Order was clear that it did so only "based on the stipulated facts of the terms of the dispute resolution provision and [WNE]'s noncompliance with same." (Doc. 27, at 7 n.7.) No such stipulations were made by WNE in the context of this Rule 12(c) Motion. Also, the Eleventh Circuit has found that exhibits attached to an answer may be considered without converting a Rule 12(c) motion to a Rule 56 motion, so long as those exhibits are both central to the plaintiff's claim and undisputed. *See Horsley*, 304 F.3d at 1134. But Rockwell did not attach the MoMs to its Answer (doc. 32). Even if it had, such exhibits cannot reasonably be deemed "central" to WNE's claims, inasmuch as WNE is not suing for breach of those agreements, does not even mention them in its First Amended Complaint, and is bringing claims that purport to stand independently of any written agreements between the parties. *See generally Adamson v. Poorter*, 2007 WL 2900576, *3 (11th Cir. Oct. 4, 2007) ("A document is not 'central' merely because it is directly responsive to a factual allegation.").

[7] *See also Lanier Const., Inc. v. Carbone Properties of Mobile, LLC*, 2007 WL 3307384 (11th Cir. Nov. 8, 2007) ("We have held that if a district court decision is interlocutory and subject to reconsideration, any constraints of the law-of-the-case doctrine are inapplicable.") (citations omitted); *F.D.I.C. v. Stahl*, 89 F.3d 1510, 1514 n.7 (11th Cir. 1996) (finding that district court misapplied law of the case doctrine where it had decided on standard of care in ruling on motion to dismiss, then deemed that decision "the law of the case" in a subsequent ruling, (Continued)

February 18 Order, in relevant part, denied Rockwell's Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) and stayed the case for 90 days to enable WNE to satisfy the provisions of the MoMs' mandatory dispute resolution clause as a condition precedent to moving forward with litigation. In no way, shape or form was the February 18 Order a final judgment; therefore, the law of the case doctrine has no application to it. Rockwell's argument to the contrary lacks merit. This Court remains free to reconsider the interlocutory order addressing the relationship between Counts I and II and the MoMs' dispute resolution clause at any time prior to entry of final judgment.[8]

Third, Rockwell's contention that the February 18 Order entitles it to judgment on the pleadings inaccurately expands the issues actually and necessarily decided in that ruling. The Rule 12(b)(6) issues presented and decided in that Order were "whether [WNE]'s claims lie within the scope of the dispute resolution provision and, if so, whether dismissal is the appropriate remedy." (Doc. 27, at 10.) The key finding of the February 18 Order was that "Counts I and II of the First Amended Complaint fall within the plain, ordinary meaning of the unambiguous language of the MoM's mandatory dispute resolution provision." (*Id.* at 13.) That Order did not address whether "the terms of the MoM controlled Counts I and II" (doc. 57, at 5) generally, as Rockwell argues, but was instead narrowly focused on the relationship between

---

because "[s]ince the denial of Defendants' motion to dismiss was not a final judgment, the decision regarding the standard of care was not the law of the case"); *Vintilla v. United States*, 931 F.2d 1444, 1447 (11th Cir. 1991) (law of the case doctrine had no application to district court's denial of motion to dismiss, which ruling was not a final judgment, such that court was free to reconsider its ruling at the summary judgment stage); *First Alabama Bank of Montgomery, N.A. v. Parsons Steel, Inc.*, 825 F.2d 1475, 1480 (11th Cir. 1987) (court's denial of summary judgment was not a final judgment and did not become the law of the case, because it was subject to reconsideration and correction at any time before final judgment).

[8]   In that regard, it bears noting that the law of the case doctrine is typically applied to render findings and conclusions by an <u>appeals court</u> binding in subsequent proceedings in the trial court or on a later appeal in the same case. *See, e.g., Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1288 (11th Cir. 2010) ("[u]nder the law of the case doctrine, the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the trial court or on a later appeal") (citations omitted); *Exxon Corp. v. United States*, 931 F.2d 874, 877 (Fed. Cir. 1991) ("Law of the case, then, merely requires a trial court to follow the rulings of an appellate court."). Obviously, that paradigm is not present here.

Counts I and II, on the one hand, and the MoMs' dispute resolution provision, on the other. This distinction is important. Earlier this month, the Supreme Court characterized the law of the case doctrine as "an amorphous concept" that is most commonly defined as positing "that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Pepper v. United States*, --- U.S. ----, 131 S.Ct. 1229, 1250 (2011) (citation omitted). What matters for law-of-the-case purposes is the "rule of law" decided in the February 18 Order, rather than subsidiary applications or extensions of that written order. Stated differently, the law of the case doctrine reaches only "those issues that were decided either explicitly or by necessary implication." *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1288 (11th Cir. 2010) (internal quotation marks omitted); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005) (doctrine "operates to preclude courts from revisiting issues that were decided explicitly or by necessary implication in a prior appeal"). The February 18 Order neither explicitly nor by necessary implication decided that the MoMs control Counts I and II in all respects, or that the disclaimer of damages provision operates to bar those causes of action.[9] Indeed, Rockwell did not invoke the disclaimer of damages clause in its Rule 12(b)(6) Motion, so the Court had no occasion to examine that issue in the context of the February 18 Order.

Fourth, even if the law of the case doctrine were generally applicable here, Rockwell would not prevail. As mentioned, this doctrine in no way prevents a trial court from revisiting its rulings prior to judgment. *See, e.g., Aldana*, 578 F.3d at 1289 ("a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court"); *Murphy*

---

[9] In arguing otherwise, Rockwell contends that the February 18 Order necessarily found that Counts I and II arise from WNE's membership in the Program. Certainly, there is language in the February 18 Order to that effect, and Rockwell is correct that such finding was a linchpin of the ruling that Counts I and II were subject to the dispute resolution provision. But that Order made no findings and expressed no opinion as to whether Counts I and II seek "incidental, indirect or consequential damages … arising directly or indirectly from member's membership … in the Program," so as to place those claims within the scope of the disclaimer of damages provision. The February 18 Order did not address the disclaimer of damages provision at all. While Rockwell is correct that the provision contains "similar" language to the mediation clause (doc. 65, at 3), "similar" is not "identical." Moreover, WNE has interposed defenses to the disclaimer of damages clause that it did not raise (and was not duty-bound to raise) in opposition to the Rule 12(b) motion pertaining to the dispute resolution clause. In short, the issues presented in the Rule 12(c) Motion are distinct from those necessarily decided in adjudicated the Rule 12(b)(6) Motion, such that the law of the case doctrine has no application.

*v. F.D.I.C.*, 208 F.3d 959, 966 (11th Cir. 2000) ("law of the case doctrine does not … require rigid adherence to rulings made at an earlier stage of a case in all circumstances"); *Aramony v. United Way of America*, 254 F.3d 403, 410 (2d Cir. 2001) ("Application of the law of the case doctrine is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment."). Reconsideration or clarification may be appropriate in this case, for a very simple reason. When the February 18 Order was entered, the parties were sparring over the relationship between Counts I and II and the dispute resolution clause of the MoM. For whatever reason, WNE chose not to raise at that time its present contention that fraud in the inducement rendered the entire MoM (including the disclaimer of damages clause) a nullity.[10] The Court does not believe that WNE's decision – whether by strategy or oversight – not to pursue that argument when Rockwell invoked the dispute resolution clause irrevocably barred it from raising such an argument when Rockwell later sought to apply a totally different portion of the MoM (*i.e.*, the disclaimer of damages clause) to defeat its claims. To hold otherwise would be both harsh and unfair, effectively punishing WNE for failing to peer around the corner and raise arguments in briefing the dispute resolution clause issue in anticipation of a future Rule 12(c) argument that Rockwell had never even asserted at that time.[11]

---

[10] Rockwell contends that in the February 18 Order, this Court "already decided that the Plaintiff's fraud allegations do not render the provisions of the contract a nullity," and that such Order rejected this very argument raised by WNE today. (Doc 65, at 6.) This characterization is wrong. Rockwell has not cited, and the Court has not found, anything in WNE's brief in opposition to the Rule 12(b)(6) Motion wherein it argued that the dispute resolution clause was unenforceable because the MoM was a nullity. And Rockwell may not put words in the Court's mouth by stating that the February 18 Order made a ruling concerning the nullity argument when it plainly did not. WNE having not raised the argument that fraud in the inducement rendered any portion of the MoM unenforceable, the February 18 Order did not have occasion to consider or pass judgment on that contention. Simply put, this "nullity" argument is a new argument that WNE did not present (and was not required to present) back at the Rule 12(b)(6) stage when Rockwell sought only to enforce the dispute resolution clause (and not the more stringent disclaimer of damages provision).

[11] Another way of looking at it is this: The stakes were fundamentally different and substantially lower at the Rule 12(b)(6) stage than they are now. Then, Rockwell was merely trying to force WNE to jump through the procedural hoop of participating in negotiations and mediation before moving forward with its lawsuit. While Rockwell sought dismissal of Counts I and II for WNE's failure to comply with the dispute resolution clause, the equities clearly favored staying the action to allow the parties to negotiate, rather than dismissing it. What this means is that, at the Rule 12(b)(6) stage, the most likely outcome if Rockwell's motion was (Continued)

The bottom line is this: In opposing judgment on the pleadings, WNE has raised a facially plausible argument that Rockwell's fraud in inducing it to enter into the MoMs and participate in the Program renders the written agreements (and the disclaimer of damage provision therein) invalid and unenforceable.[12] Even if the law of the case doctrine applied (which it does not), the Court would not allow Rockwell to utilize it to cut off WNE's ability to raise that argument at this time. Rather, any portions of the February 18 Order that might affect the relationship between the MoMs' damages disclaimer provisions and Counts I and II are subject to reconsideration. Therefore, Rockwell's Motion for Judgment in the Pleadings is **denied** insofar as it seeks dismissal of Counts I and II on a "law of the case" rationale.[13]

---

granted was that the case would be stayed for a time and the parties would be ordered to mediation. By contrast, at the Rule 12(c) stage, if Rockwell prevails, the only likely outcome would be dismissal of Counts I and II on the merits. It would be unreasonable and inequitable in the context of the Rule 12(c) Motion to constrain WNE to legal arguments made in opposing the relatively inconsequential Rule 12(b)(6) Motion, and to declare that WNE is foreclosed from raising new or different arguments today concerning the relationship between Counts I and II and the MoM, or the enforceability of any provisions of the MoM, that it did not raise during the motion practice concerning the dispute resolution clause. Such an inequitable result is, in essence, what Rockwell seeks to force via its invocation of "law of the case" and its theory that the February 18 Order represents the final, binding ruling concerning the relationship between Counts I and II and the MoM.

[12] The legal principle on which this argument is based appears to have traction in Wisconsin law. *See, e.g., Bank of Sun Prairie v. Esser*, 456 N.W.2d 585, 588 (Wis. 1990) ("A material misrepresentation of fact may render a contract void or voidable."); *Merten v. Nathan*, 321 N.W.2d 173, 176 n.2 (Wis. 1982) (reviewing the "elements of fraudulent misrepresentation rendering a contract voidable"); *Consumer Products Research & Design, Inc. v. Jensen*, 2007 WL 5613316, *3 (W.D. Wis. May 17, 2007) (defendant's "contention that he was fraudulently induced to execute the agreement … constitutes a contract defense rendering the contract void, as well as a fraud counterclaim").

[13] Although the parties have not raised it, another aspect of the "disclaimer of damages" clause of the MoMs bears mention at this time. That clause does not purport to exclude <u>all</u> damages, but only those "INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES" (doc. 57, Exh. A) arising from WNE's membership in the Program. Rockwell does not explain why it believes the damages sought in Counts I and II fall within these specific categories. Wisconsin courts have typically used that terminology in connection with breach of contract claims (which Counts I and II are not). *See, e.g., Towne Realty, Inc. v. Zurich Ins. Co.*, 548 N.W.2d 64, 69 n.4 (Wis. 1996) ("contract damages can also include consequential and incidental damages"); *Owens v. Myers Sales Co.*, 385 N.W.2d 234, 235 (Wis. App. 1986) (Continued)

### B. Wisconsin's Economic Loss Rule.

As an alternative ground for seeking judgment on the pleadings, Rockwell invokes Wisconsin's economic loss rule. According to Rockwell, that doctrine bars Counts I and II by forbidding WNE from recovering in tort for economic losses sustained pursuant to the WNE/Rockwell contractual relationship. Under Wisconsin law, "[t]he economic loss doctrine is a judicially created rule that precludes contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Wickenhauser v. Lehtinen*, 734 N.W.2d 855, 868 (Wis. 2007) (citation and internal marks omitted); *see also Insurance Co. of North America v. Cease Electric Inc.*, 688 N.W.2d 462, 467 (Wis. 2004) ("The economic loss doctrine precludes parties under certain circumstances from eschewing the more limited contract remedies and seeking tort remedies.").[14]

In response to this argument, WNE first contests the proposition that Wisconsin law applies. To be sure, the MoMs do contain a choice of law provision reading as follows: "This MOM, the Program and all disputes arising thereunder will be governed by and interpreted in accordance with the internal laws of the State of Wisconsin." (Doc. 57, Exh. A.) But WNE insists, with no citations to authority, that "if the contract was induced by fraud, all aspects of the contract, to include the choice of law provisions, are void." (Doc. 63, at 6.) There is extensive authority for the proposition that fraud in the inducement for a contract generally does not invalidate a choice of law or forum selection clause, unless the fraud was specific to that clause.

---

("Incidental damages resulting from a seller's breach include any reasonable expense incident to the breach."); *IW Enterprises v. Kopas*, 2004 WL 1661072, *5 (Wis.App. July 27, 2004) (distinguishing between "consequential damages for breach of contract" and "damages on the misrepresentation claim"); *Trenhaile v. J.H. Findorff & Son, Inc.*, 2004 WL 1057601, *4 (Wis. App. May 4, 2004) ("Consequential damages may be awarded for a breach of contract if such damages are reasonably foreseeable at the time the contract was made."); *City of Stoughton v. Thomasson Lumber Co.*, 675 N.W.2d 487, 498 n.8 (Wis.App. 2003) (defining incidental and consequential damages in breach of warranty context). That said, the Court need not and does not definitively decide this question for purposes of adjudicating the pending Rule 12(c) Motion.

[14] Wisconsin courts have generally applied the economic loss doctrine in the products context. *See, e.g., 1325 North Van Buren, LLC v. T-3 Group, Ltd.*, 716 N.W.2d 822, 831 (Wis. 2006) ("The economic loss doctrine is a judicially created doctrine under which ***a purchaser of a product cannot recover from a manufacturer*** on a tort theory for damages that are solely economic.") (citations omitted and emphasis added).

*See Liles v. Ginn-La West End, Ltd.*, 631 F.3d 1242, 1248 n.11 (11th Cir. 2011) ("To be unenforceable, the inclusion of the choice clause itself must be the product of fraud – more general claims of fraud will not defeat a choice clause and are properly litigated in accordance with the parties' contractually chosen forum.").[15] Plaintiff has identified neither countervailing precedent nor any compelling rationale to the contrary. And there is no allegation that Rockwell's purported fraud in inducing WNE's execution of the MOMs and participation in the Program was in any way specific to the choice-of-law provision. For these reasons, the Court does not accept WNE's premise that Wisconsin law is inapplicable, and declines its request to apply Alabama's economic loss rule, to Rockwell's Rule 12(c) Motion.

Nonetheless, there is a straightforward reason why Wisconsin's economic loss rule does not bar WNE's fraud claims as a matter of law. As plaintiff correctly observes, Wisconsin courts recognize a clear distinction between contracts for services (to which the doctrine does not apply) and contracts for goods (to which it does). Indeed, Wisconsin law is unambiguous that "the economic loss doctrine is inapplicable to claims for the negligent provision of services. This bright line rule will limit the uncertainty and increased litigation that would accompany any other decision." *Cease Electric*, 688 N.W.2d at 472; *see also Stuart v. Weisflog's Showroom Gallery, Inc.*, 746 N.W.2d 762, 773 (Wis. 2008) (reaffirming "bright line rule" from *Cease Electric* and finding that economic loss rule does not apply to contract for architectural services). Simply put, "[i]f the contract is purely a service contract, the economic loss doctrine does not apply." *1325 North Van Buren, LLC v. T-3 Group, Ltd.*, 716 N.W.2d 822, 832 (Wis. 2006); *see also Shister v. Patel*, 776 N.W.2d 632, 637 (Wis.App. 2009) (reiterating "that the economic loss doctrine is inapplicable to claims for the negligent provision of services"); *Trinity Lutheran Church v. Dorschner Excavating, Inc.*, 710 N.W.2d 680, 686 (Wis. App. 2006) ("the economic

---

[15] *See also Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1296 (11th Cir. 1998) (determining that plaintiff must specifically "allege that the choice [of law] clause itself was included in the contract due to fraud in order to succeed in a claim that the choice clause is unenforceable"); *Walker v. Hallmark Bank & Trust, Ltd.*, 707 F. Supp.2d 1322, 1325 (S.D. Fla. 2010) ("the fraud must be specific to a forum selection clause in order to invalidate it"); *see generally Rucker v. Oasis Legal Finance, L.L.C.*, --- F.3d ----, 2011 WL 476519, *5 (11th Cir. Feb. 11, 2011) (rejecting argument that where purchase agreements are void under Alabama law, forum selection clauses contained therein are necessarily void, inasmuch as "[a] forum selection clause is viewed as a separate contract that is severable from the agreement in which it is contained").

loss doctrine applies to only contracts for products, not to contracts for services"); *RxUSA, Inc. v. Capital Returns, Inc.*, 2007 WL 2712958, *12 (E.D. Wis. Sept. 14, 2007) ("In the present case, the contract between Plaintiffs and Defendants is a service contract. Thus, the economic loss doctrine does not bar the Plaintiffs' negligence claim.").[16]

It cannot reasonably be claimed – and defendant does not attempt to argue – that the MoMs entered into between WNE and Rockwell were not service contracts, but were instead contracts for products or goods. After all, the agreements' stated purpose was "to facilitate cooperative marketing efforts" between the parties, including allowing WNE (i) to list and maintain certain information regarding particular products, (ii) to purchase marketing services from Rockwell, (iii) to obtain equipment and training for development and demonstration of products, and so on. (Doc. 57, Exh. A.) The primary purpose of these contracts was not the sale of goods or products, but was instead the sharing of information and marketing services and collaborative strategies by the signatories. This form of agreement falls squarely within the service-contract exception to Wisconsin's economic loss doctrine.[17]

---

[16] The Wisconsin Supreme Court justified this service-contract exclusion to the economic loss doctrine by recognizing the lack of availability of Uniform Commercial Code remedies for breach of service contracts. Indeed, *Cease Electric* reasoned that contract law is not "better suited than tort law for dealing with purely economic loss in the context of service agreements" because "[u]nlike contracts for products or goods, which enjoy the benefit of well-developed law under the U.C.C., no such benefit exists for contracts for services. This is because the U.C.C. does not apply to service contracts. … Given the inapplicability of the U.C.C. to service contracts, we decline to extend the economic loss doctrine in this case." 688 N.W.2d at 469.

[17] The case law reveals that, where a contract has a mixed purpose of both services and goods, Wisconsin courts assess the "predominant purpose" of the agreement to decide whether the economic loss rule does or does not apply. The predominant purpose test requires examination of the totality of the circumstances, including such factors as "the language of the contract, the nature of the business of the supplier, the intrinsic worth of the materials, … the circumstances of the parties, and the primary objective they hoped to achieve by entering into the contract." *Linden v. Cascade Stone Co.*, 699 N.W.2d 189, 196 (Wis. 2005). Under any reasonable application of that test to the MoMs executed by WNE and Rockwell, those contracts were predominantly (if not exclusively) for services, and therefore lie outside the scope of the economic loss doctrine. Rockwell has not argued, much less demonstrated, that the predominant purpose of those agreements was a transaction in goods or products, rather than services.

Notwithstanding the clear application of the service-contract exception in this case, Rockwell urges this Court to apply the economic loss rule anyway. In so doing, Rockwell decries reliance on bright line rules as "sticking its head in the sand" and "ignor[ing] the policy reasons which buttress the application of the doctrine in this instance." (Doc. 65, at 12.) The problem with defendant's line of reasoning is that the Wisconsin Supreme Court has clearly and repeatedly endorsed a bright line rule <u>excluding</u> service contracts from the ambit of the economic loss rule. It is not the place of a federal court -- applying state law -- to reweigh the policy underpinnings of a rule and rewrite it in a manner that it deems more efficacious in promoting those objectives. This Court will not substitute its judgment for that of Wisconsin's high court in developing Wisconsin law.[18] Stated differently, the Wisconsin Supreme Court in *Cease Electric* and its progeny expressly chose to frame the service contract exception in bright-line terms. This Court cannot look behind or second-guess the wisdom of the Wisconsin high court's decisions, much less supplant them with its own vision of what it thinks the rule ought to be. The *Cease Electric* line of decisions deliberately eschew the nuanced, case-by-case, policy-driven approach championed by Rockwell, in favor of a "bright line rule [that] will limit the uncertainty and increased litigation that would accompany any other decision." *Cease Electric*, 688 N.W.2d at 472. This Court will not assume that the Wisconsin Supreme Court failed to grasp the import of its own words, or that it was heedless of the limitations and ramifications of the rule it selected. Accordingly, Rockwell's invitation to this Court to redraft Wisconsin law as it relates to the economic loss doctrine in the service contract context must be declined.

Rockwell is correct, of course, that the economic loss doctrine has continued to evolve at the hands of Wisconsin courts in the six-plus years since *Cease Electric* was decided. But none of the cases cited by Rockwell, and none that the undersigned's research has uncovered, suggest

---

[18] *See generally World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*, 586 F.3d 950, 957 (11th Cir. 2009) ("When we address issues of state law, … we are bound by the decisions of the state supreme court."); *LeFrere v. Quezada*, 582 F.3d 1260, 1262 (11th Cir. 2009) ("state supreme courts are the final arbiters of state law"); *Blue Cross & Blue Shield of Ala., Inc. v. Nielsen*, 116 F.3d 1406, 1413 (11th Cir. 1997) ("the only authoritative voice on Alabama law is the Alabama Supreme Court"); *Green v. Amerada-Hess Corp.*, 612 F.2d 212, 214 (5th Cir. 1980) ("it is not our province as a federal appellate court to fashion for (a state) what we are certain many would say was a wise and progressive social policy") (citation omitted).

that Wisconsin's high court has ever jettisoned or abrogated the rule in *Cease Electric*. To the contrary, the bright-line service contract exception to the economic loss rule appears to be intact today. In that regard, one federal district court pointed out the many grey areas in the application and contours of Wisconsin's economic loss doctrine, yet recognized that "[t]he only type of relationship the court has recognized as exempt [from the rule] is one for services, primarily on the ground that service contracts are not protected by the [U.C.C.]." *Zimmerman v. Logemann*, 2009 WL 4407205, *8 (W.D. Wis. Nov. 30, 2009). In other words, even in this shifting and uncertain body of Wisconsin law, a clear rule has emerged that service contracts are exempt. This Court will not erode the *Cease Electric* rule in the absence of any indication that Wisconsin courts have done so or would do so in circumstances such as those present here.

In any event, economic damages falling within the scope of the economic loss doctrine are defined as "those arising because the product does not perform as expected, including damage to the product itself or monetary losses caused by the product." *Stuart*, 746 N.W.2d at 773 (citation omitted). The First Amended Complaint does not suggest that WNE is seeking damages for a product's failure to perform as expected; therefore, the economic loss doctrine is inapplicable for this additional reason as well. *See id.* (where plaintiffs' damages resulted from alleged negligent design and construction practices, not failure of construction supplies and products, economic loss doctrine is inapplicable for that reason).

The agreements at issue here are contracts for services, not goods or products. They do not implicate any recognized exception to Wisconsin's rule that service contracts are exempt from the economic loss rule. Accordingly, Rockwell's Motion for Judgment on the Pleadings is due to be **denied** insofar as it hinges on that rule.[19]

---

[19] Rockwell's economic loss rule argument also fails for an entirely independent, distinct reason. In particular, Wisconsin has "adopted a narrow fraud in the inducement exception to the economic loss doctrine." *Wickenhauser*, 734 N.W.2d at 868; *see also Digicorp, Inc. v. Ameritech Corp.*, 662 N.W.2d 652, 662 (Wis. 2003) ("we hold that there is indeed a fraud in the inducement exception to the economic loss doctrine"). To invoke that exception, a party must show that: "(1) there was an intentional misrepresentation …; (2) the misrepresentation occurred before the contract was formed …; and (3) the fraud [was] extraneous to, rather than interwoven with, the contract." *Wickenhauser*, 734 N.W.2d at 869 (citation omitted). WNE's position is that Rockwell repeatedly lied to it, both at the inception of their contractual relationship and upon each renewal of same, by representing to WNE that it was not developing (and had no plans to develop) competitive products to WNE's EtherNet/IP switches, when in fact
(Continued)

**III.   Conclusion.**

For all of the foregoing reasons, defendant's Motion for Judgment on the Pleadings (doc. 57) is **denied**.  Neither the law of the case doctrine nor Wisconsin's economic loss rule entitles Rockwell to Rule 12(c) relief.

DONE and ORDERED this 25th day of March, 2011.

s/ WILLIAM H. STEELE<br>CHIEF UNITED STATES DISTRICT JUDGE

---

it had such plans and was doing exactly that.  Such allegations, if proven, would satisfy all three prongs of the fraud in the inducement exception to Wisconsin's economic loss doctrine.

Rockwell protests that such statements, if made, were mere representations as to future events, rather than present facts, such that they were not misrepresentations at all.  However, obvious fact questions on that point (as to Rockwell's then-existing plans and development activities) preclude Rule 12(c) relief.  And Rockwell's contention that the alleged fraud was "interwoven" with the MoM is incorrect as a matter of law.  Under Wisconsin law, a misrepresentation is extraneous to, and not interwoven with, a contract if "the fraud concerns matters whose risk and responsibility did not relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involved performance of the contract." *Wickenhauser*, 734 N.W.2d at 869 (citation omitted); *see also Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 220 (Wis. 2005) (alleged fraudulent representation held not interwoven with contract, where it did not concern parties' performance of contract or quality or character of goods sold, but instead "concerned a matter [Kellogg's undisclosed change in marketing strategy] whose risk was never contemplated to be a part of the contract to purchase Kellogg's products"); *Zimmerman*, 2009 WL 4407205, at *9 (representations to induce plaintiff to accept loan deemed extraneous, and not interwoven, where none of them relate to the quality or characteristics of the goods for which parties contracted or otherwise involved performance of the contract).  Here, as pleaded by plaintiff, Rockwell's alleged misrepresentations concerning its own business plans and activities did not relate to the quality or characteristics of any goods contemplated by the MoMs, and did not otherwise involve Rockwell's performance of the Encompass Program contemplated by the MoMs.  Therefore, the Court agrees with WNE that the alleged fraud was extraneous to the contracts.  For all of these reasons, even if the service-contracts exception to Wisconsin's economic loss doctrine did not apply, the Court would nonetheless deny Rockwell's Rule 12(c) Motion predicated on that doctrine based on its determination that the facts as pleaded support application of the fraud in the inducement exception.  Thus, the fraud in the inducement exception provides a separate and independent ground for denying the Motion for Judgment on the Pleadings.